**TRIGEANT HOLDINGS, LTD.**
**and Trigeant Holdings,**
**LLC, Appellants,**

v.

**Jerral W. JONES, Appellee.**

**No. 01–04–00542–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 17, 2005.

Rehearing Overruled Dec. 15, 2005.

Jan Woodward Fox, Mary A. Van Kerrebrook, Elder, Van Kerrebrook & Corpening, LLP, Jennifer R. Tillison and Kevin Dubose, Alexander Dubose Jones & Townsend LLP, Houston, TX, for Appellants.

Kenneth T. Fibich, Fibich, Hampton, Leebron & Garth, L.L.P., Lynne Liberato, Alene Ross Levy, Mark Trachtenberg, Haynes & Boone, L.L.P., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, HANKS, and HIGLEY.

## OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

We withdraw our Opinion of July 28, 2005 and issue the following Opinion in its

stead. We deny the appellants' motion for rehearing.

■ This is an accelerated, interlocutory appeal from the trial court's denial of a special appearance filed by appellants, Trigeant Holdings, Ltd. and Trigeant Holdings, LLC (collectively "the Trigeant Holdings entities"). *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon Supp.2004–2005). The Trigeant Holdings entities argue that the trial court erred by denying their special appearance for the following reasons: (1) the trial court lacked specific jurisdiction over the Trigeant Holdings entities because none of the appellee's, Jerral W. Jones's, causes of action arose out of activities that the Trigeant Holdings entities purposefully directed toward Texas; (2) the trial court lacked general personal jurisdiction over the Trigeant Holdings entities which had no continuous and systematic contacts with Texas;[1] and (3) the exercise of personal jurisdiction over the Trigeant Holdings entities would not comport with fair play and substantial justice. We affirm the trial court's denial of the Trigeant Holdings entities' special appearance.

## Background

In 1982, Jerral W. Jones and Sanford Brass, both Texas residents, jointly executed a secured promissory note for $15,200,000. The funds were invested in Sentry Refining, Inc., a refinery jointly owned by Jones and Brass. Jones and Brass eventually defaulted on the note, prompting the Federal Deposit Insurance Corporation ("FDIC") to bring suit against Jones and Brass to collect the balance owed.

Jones agreed to settle the case by personally paying $13,700,000 to the FDIC. As part of the settlement, Jones divested himself of all ownership interest in Sentry Refining, Inc. and transferred full ownership to Brass. In return, Brass executed three promissory notes to Jones intended to secure repayment of the $13,700,000 personally expended by Jones.

In 1987, Jones and Brass entered into an amended settlement agreement pertaining to the debt Brass owed Jones. The amended agreement provided that payment on two of the notes, in the combined principal amount of $6,525,000, would be "non-recourse" to Brass, that is, Brass would not be personally liable on the notes. The amended agreement further provided that the payment on the two notes was to come from profits, distributions, or liquidation proceeds derived from Brass's interest in a refinery located in Corpus Christi, Texas.[2] The Corpus Christi refinery was controlled by Trifinery Joint Venture ("TJV"), a Texas company in which Brass owned a 50% interest and into which Brass had transferred the assets of Sentry Refining, Inc.

Over the course of years, Brass represented to Jones that TJV was unprofitable. Brass claimed that TJV was unable to make any distributions to its shareholders, and Brass, therefore, could not make any payments to Jones. As a result, Brass did not make any payments on the notes. In 1994, TJV transferred all of its interest in the Corpus Christi refinery to Trifinery

---

1. Jones concedes that he did not allege general jurisdiction as a basis for jurisdiction in the trial court; therefore, we need not address this point of error on appeal.

2. Specifically, Brass agreed that he would "... assign to Jones all distributable cash profits, cash dividends, distributions of cash flow or distributable cash sale or liquidation proceeds ("Distributions") attributable to Brass' partnership interest in Trifinery and/or stock interest in Petroserve Services, Inc."

Petroleum Services ("TPS"), another Texas company in which Brass also owned a 50% interest. Brass later bought the other one-half-interest, giving him 100 % ownership of the Trifinery assets.

In 1999, Jones brought a declaratory judgment action against Brass in an attempt "to enforce the terms, obligations and conditions" in the settlement agreement addressing Brass's repayment to Jones. Jones further alleged breach of contract and breach of implied covenant of good faith and fair dealing.

On June 29, 2001, while Jones's suit against Brass was pending and pursuant to an Asset Purchase Agreement executed in Houston, Texas, TPS sold its interest in the Corpus Christi refinery for $17,663,665 to Trigeant, Ltd., a Florida company in which Brass's son and Texas resident, Arthur Brass, owned a 48.51% interest. Jones alleged that, at the time of Trigeant, Ltd.'s purchase of the Corpus Christi refinery, the fair market value of the refinery was $38,000,000 to $44,000,000—more than twice the amount of the sale.

On the same day as the sale of the Corpus Christi refinery to Trigeant, Ltd., the Trigeant Holdings entities also executed a Capitalization Agreement in Houston, Texas to purchase a 100% equitable ownership of Trigeant, Ltd. Pursuant to this agreement, the Trigeant Holdings entities acquired a 100% equitable ownership interest in all of Trigeant, Ltd.'s assets, including the Corpus Christi refinery.[3] Additionally, under this agreement, Arthur Brass exchanged his 48.51% interest in Trigeant, Ltd. for a 25% equity interest in the Trigeant Holdings entities and received a cash distribution from the Tri-

geant Holdings entities in an amount exceeding $1,000,000.

Jones joined the Trigeant Holdings entities, Arthur Brass, Trigeant, Ltd., TJV, and TPS to the suit pending against Sanford Brass. In addition to the causes of action already asserted against Sanford Brass, Jones sued the entities under the Texas Uniform Fraudulent Transfers Act ("UFTA") for fraudulently transferring the refinery assets and its proceeds to various entities to avoid paying any of the proceeds to Jones. Jones also sued these entities for civil conspiracy alleging that they conspired to design and implement this scheme to fraudulently transfer the refinery assets and its proceeds to prevent Jones from receiving them.[4] Sanford Brass, Arthur Brass, Trigeant, Ltd., TJV, and TPS filed answers; however, the Trigeant Holdings entities filed a special appearance and answered subject to their special appearance.

The Trigeant Holdings entities' special appearance asserted that the trial court did not have jurisdiction over them for the following reasons: (1) the Trigeant Holdings entities were formed and continued to exist under the laws of Florida and were not residents of Texas, no formal meetings took place in Texas, and the Trigeant Holdings entities did not conduct business in Texas; (2) the sale of the Trifinery assets was not made for the Trigeant Holdings entities' benefit and the Trigeant Holdings entities did not engage in any specific acts within Texas in connection with the asset sale; and (3) Jones's allegations were insufficient to confer jurisdiction. Additionally, the Trigeant Holdings entities attached evidence in the form of an affidavit from Robert J. Stefans, Jr., Vice President of Trigeant Holdings, LLC. In

---

**3.** Texas resident, Arthur Brass, was also one of the signatories to this agreement.

**4.** Jones also claimed that Sanford Brass, individually, was liable for breach of contract and actual fraud.

his affidavit, Stefans testified to the following:

- Trigeant Holdings, LLC is a Florida limited liability company;
- Trigeant Holdings, Ltd. is a Florida limited partnership;
- the Trigeant Holdings entities were formed and continue to exist under the laws of the State of Florida;
- Trigeant Holdings, Ltd. is the holding company for various entities including Trigeant, Ltd.;
- Trigeant Holdings, LLC is the general partner of Trigeant Holdings, Ltd.;
- neither Trigeant Holdings entity has ever been served with a lawsuit in Texas other than this suit;
- neither Trigeant Holdings entity maintains a place of business in Texas;
- neither Trigeant Holdings entity maintains any agents or employees in Texas;
- neither Trigeant Holdings entity owns any entity formed under Texas law, although Trigeant Holdings, LLC has ownership interests in some entities which do business in Texas, including Trigeant, Ltd.;
- the registered agent for the Trigeant Holdings entities is in Miami, Florida;
- all formal meetings for the Trigeant Holdings entities are conducted in Florida;
- neither Trigeant Holdings entity conducts any business, owns property, or has any bank accounts in Texas;
- the sole office for the Trigeant Holdings entities is in Boca Raton, Florida;
- neither Trigeant Holdings entity has engaged in any business with Jones or Sanford Brass; and
- neither Trigeant Holdings entity has ever received a conveyance of any assets from TPS or of any assets formerly belonging to TPS.

In his response to the Trigeant Holdings entities' special appearance, Jones alleged that,

during the course of this litigation, Brass' [sic] took his scheme to deprive Jones of any payment under the settlement agreement to a new level. In 2001, he conspired with his son, Arthur J. Brass, and others to sell the refinery business without paying any sale proceeds to Jones. The conspirators designed a fraudulent scheme to prevent Brass's receipt of net sale proceeds, which necessarily would have been applied to the payment of [the two notes].

Accordingly, Jones argued that the trial court had specific jurisdiction over the Trigeant Holdings entities and attached the following evidence in support of his allegations that the proceeds of the refinery were being fraudulently transferred to various entities and Arthur Brass:

- two independent appraisals from 2000 and 2001, showing that the fair market value of the Trifinery business was between $28,000,000 and $45,600,000;
- the Asset Purchase Agreement executed in Houston, Texas in 2001 between TPS and Trigeant, Ltd., showing that the Trifinery assets were sold for $17,663,665;
- the Trigeant, Ltd., Limited Partnership Agreement, showing that Arthur Brass owned 48.51% and Trigeant Holdings, LLC owned 1% of Trigeant, Ltd. at the time of Trigeant, Ltd.'s purchase of the Trifinery assets;
- the Employment Agreement between Trigeant, Ltd. and Arthur Brass reflecting that Arthur Brass was to be paid $400,000 a year to serve as director of business development for Trigeant, Ltd.;

– a promissory note indicating that Arthur Brass owed Harry Sargeant, III (his partner in Trigeant, Ltd. and manager of Trigeant Holdings, LLC) $490,000;[5]

– a Consulting Agreement indicating that Sanford Brass was paid $20,833.33 a month and the use of a driver and car to consult with Trigeant, Ltd.;

– the Capitalization Agreement of Trigeant Holdings, Ltd. executed in Houston, Texas in 2001 reflecting Arthur Brass's transfer of his equity interest in Trigeant, Ltd. in exchange for a 25% membership interest in Trigeant Holdings, Ltd.; and

– excerpts from Arthur Brass's deposition during which he testified about the income he received for his partnership interest in the Trigeant Holdings entities.

Jones alleged that all proceeds from the transfer of assets to the Trigeant Holdings entities and those proceeds paid to Arthur Brass should have been applied to repay the settlement notes owed to him. Jones did not allege general jurisdiction, did not rely on an alter ego theory, and did not assert the parent-subsidiary relationship as a basis for jurisdiction.

The trial court denied the Trigeant Holdings entities' special appearance.

## Special Appearance

### Standard of Review

 The plaintiff bears the initial burden of pleading sufficient allegations to bring a non-resident defendant within the personal jurisdiction of a Texas court. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002).

However, upon filing a special appearance, the non-resident defendant assumes the burden to negate all the bases of personal jurisdiction alleged by the plaintiff. *Id.* The existence of personal jurisdiction is a question of law, reviewed de novo, but that determination must sometimes be preceded by the resolution of underlying factual disputes. *Preussag Aktiengesellschaft v. Coleman,* 16 S.W.3d 110, 113 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). Although findings of fact are not required, when, as here, the trial court does not file findings of fact in a special appearance, all questions of fact are presumed to support the judgment. *See* TEX. R.APP. P. 28.1; *Ace Ins. Co. v. Zurich Am. Ins. Co.,* 59 S.W.3d 424, 427 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

## Personal Jurisdiction and Due Process Requirements

 Texas courts may assert personal jurisdiction over a non-resident defendant only if the Texas long-arm statute authorizes jurisdiction and the exercise of jurisdiction is consistent with federal and state due process standards. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). The Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow." *Id.* Thus, the Texas long-arm statute requirements are satisfied if exercising jurisdiction comports with federal due process limitations. *Id.* We rely on precedent from the United States Supreme Court as well as our own state's supreme court decisions in determining whether a non-resident defendant has met its burden to negate all bases of jurisdiction. *BMC Software,* 83 S.W.3d at 795.

---

**5.** Jones argues that this promissory note is significant because it shows that Arthur Brass was able to "buy" his 48.51% ownership in Trigeant, Ltd. without spending any of his own money.

Under the Due Process Clause of the Fourteenth Amendment, jurisdiction is proper if a non-resident defendant established "minimum contacts" with Texas and maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Accordingly, we focus upon the defendant's activities and expectations in deciding whether it is proper to call it before a Texas court. *Id.*

The minimum-contacts analysis requires that a defendant "purposefully avail" itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of our laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). A defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. Jurisdiction is premised on notions of implied consent that, by invoking the benefits and protections of a forum's laws, a non-resident consents to suit there. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784–85, 48 Tex. Sup.Ct. J. 78 (Tex. 2005).

A defendant is not subject to jurisdiction here if its Texas contacts are random, fortuitous, or attenuated. *See id.; Guardian*, 815 S.W.2d at 226. Nor can a defendant be haled into a Texas court based on the unilateral acts of a third party. *Michiana*, 168 S.W.3d at 784–85. It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis. *Guardian*, 815 S.W.2d at 230 n. 11.

## Specific Jurisdiction

A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996). Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Blair Communications, Inc. v. SES Survey Equip. Serv., Inc.*, 80 S.W.3d 723, 727 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.*, 835 S.W.2d 645, 650 (Tex. App.-Houston [14th Dist.] 1992, no writ). The contacts must be purposely directed at or take place within the forum and must have a "substantial connection" that results in the alleged injuries. *Mem'l Hosp. Sys.*, 835 S.W.2d at 650. Merely contracting with a Texas citizen does not, by itself, satisfy the minimum contacts requirement. *Id.* Rather, the focus of the examination must be the nature of the contacts and the "nexus" these contacts create with the forum state. *McDermott v. Cronin*, 31 S.W.3d 617, 621–22 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

## Application of the Texas Long—Arm Statute

The Trigeant Holdings entities initially argue that the trial court lacks specific jurisdiction over them because they did not commit any tort in whole or in part in Texas as required for personal jurisdiction by the Texas Long–Arm Stat-

ute.[6] They argue that, as a matter of law, they cannot be held liable for any alleged violation of the UFTA because (1) they are not "transferees" under the statute and (2) the statute does not give Jones any remedy against them. We disagree.

### Commission of Tort—Violation of UFTA

■■■■ The Trigeant Holdings entities are transferees and subject to liability under the UFTA. The UFTA not only creates liability against "the person for whose benefit the transfer was made," such as the debtor, but also against "the first transferee of the asset," or any "subsequent transferee." *See* Tex. Bus. & Com. Code Ann. § 24.009(b) (Vernon 2002); [7] *see also Amoco Chem. Co. v. Tex Tin Corp.,* 925 F.Supp. 1192, 1200–01 (S.D.Tex.1996). The UFTA does not define who is a "transferee" under the statute. It does, however, specifically define the term "transfer." Under the UFTA, "transfer" means *"every mode,* direct or *indirect,* absolute or conditional, voluntary or involuntary, *of disposing of or parting with an asset or an interest in an asset,* and includes payment of money, release, lease,

and creation of a lien or other encumbrance." Tex. Bus. & Com.Code Ann. § 24.002(12) (Vernon 2002) (emphasis added). Under this broad definition of "transfer," the purchase by and transfer to the Trigeant Holdings entities of an equitable interest in the Corpus Christi refinery—the very subject of Jones's causes of action—renders the Trigeant Holdings entities "transferees" under· the UFTA. *See, e.g., Tel. Equip. Network v. TA/Westchase Place Ltd.,* 80 S.W.3d 601, 611 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding that party became a "transferee" under UFTA once it acquired a lien against asset alleged to have been fraudulently transferred.)

Likewise, Jones has a potential remedy against the Trigeant Holdings entities. The expansive language of the UFTA's "remedy" section provides Jones with a broad range of remedies that can be sought from subsequent transferees, such as the Trigeant Holdings entities, if they are found to have participated in the fraudulent transfer of assets. Section 24.008, entitled "Remedies of Creditors," provides as follows:

6. The Texas long-arm statute allows a Texas court to exercise personal jurisdiction over a non-resident defendant who does business in Texas. Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997). A non-resident does business in Texas if it (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) *commits a tort in whole or in part in this state;* or (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state. *Id.*

7. Section 24.009, entitled "Defenses, Liability, and Protection of Transferee," provides

 (a) A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or

against any subsequent transferee or obligee.

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

Tex. Bus. & Com.Code Ann. § 24.009(a), (b) (Vernon 2002).

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:

 (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

 (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or

 (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

 (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

 (B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

 (C) *any other relief the circumstances may require.*

TEX. BUS. & COM.CODE ANN. § 24.008(a) (Vernon 2002) (emphasis added). *See, e.g., Airflow Houston Inc. v. Theriot*, 849 S.W.2d 928, 934 (Tex.App.-Houston [1st Dist.] 1993, no writ) (interpreting UFTA's broad equitable remedy language, by holding that judgment against transferee for entire amount of debt owed to defrauded creditor was permitted under equitable relief provisions of UFTA, regardless of whether entire value of asset or interest in

asset was ever received by transferee); *Gutierrez v. Givens*, 1 F.Supp.2d 1077, 1087 (S.D.Cal.1998) (interpreting the UFTA's broad equitable remedy language to mean that, when sufficient allegations exist regarding an entity's complicity with a debtor to fraudulently transfer assets, it was possible for debtor to make a claim for relief against entity). Accordingly, it is possible for Jones to obtain a remedy against the Trigeant Holdings entities under the UFTA if it is found, as alleged by Jones, that they received fraudulently transferred assets in bad faith and in complicity with Sanford Brass.[8]

**Minimum Contacts**

 Next, the Trigeant Holdings entities argue that they do not have sufficient minimum contacts with Texas for the trial court to exercise specific jurisdiction over them. We disagree.

The contact at issue is the Trigeant Holdings entities' participation in a transaction in Houston, Texas. The crux of Jones's claims against the Trigeant Holdings entities for violation of the UFTA and civil conspiracy is that, by executing the Capitalization Agreement in Houston, Texas, the Trigeant Holdings entities purchased and received a 100% equitable ownership of Trigeant, Ltd., and, thus, equitable ownership of the very assets at issue in this case-the Corpus Christi, Texas refinery and any proceeds from this refinery. Jones alleges that this agreement was executed so that Sanford Brass and Trigeant, Ltd. could avoid paying these future refinery proceeds to Jones, a Texas resident. Jones also alleges that

---

**8.** Relying on the holding in *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995), the Trigeant Holdings entities also argue that, because there can be no valid claim against them under the UFTA, Jones's allegations regarding the Trigeant Holdings entities' participation in a civil conspiracy are insuffi-

cient to establish jurisdiction under the Texas Long–Arm Statute. Because, as shown above, such a claim under the UFTA may exist, we need not address this argument. We will proceed to examine the nature and quality of the *Trigeant Holdings* entities contacts with Texas.

the agreement was executed so that some of these proceeds would go to Brass's son, Arthur, also a Texas resident, in the form of consulting fees and a cash distribution. Jones further alleges that the Trigeant Holdings entities executed the Capitalization Agreement with specific knowledge that there was a lawsuit pending in Texas regarding the proceeds from the Corpus Christi refinery.

By participating in a Texas transaction involving the transfer of Texas-based assets to allegedly defraud a Texas resident, the Trigeant Holdings entities purposefully availed themselves of the benefits and privileges of conducting business in Texas. The Trigeant Holdings entities' contact with Texas was not the result of a unilateral act of a third party nor was it random or fortuitous; it was the direct and intended consequence of their execution of the Capitalization Agreement. As a result of this contact, the Trigeant Holdings entities, not Jones, became the beneficiaries of any future income streams generated by the refinery in Texas. This contact is the focus of Jones's alleged injuries. Under these circumstances, it would not offend the notions of fair play and substantial justice for the trial court to exercise specific jurisdiction over the Trigeant Holdings entities and require them to defend this action in Texas.

### Conclusion

We affirm the order of the trial court.