Opinion issued September 13, 2007


 











In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00802-CV






CONTROL SOLUTIONS, INC. AND UNITED PHOSPHOROUS, INC.,
Appellants


V.


GHARDA CHEMICALS LTD., Appellee






On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2004-67993






O P I N I O N

 Appellants, Control Solutions, Inc. and United Phosphorous, Inc. (collectively,
"CSI"), file this interlocutory appeal challenging the trial court's order that granted
the special appearance motion of Gharda Chemicals, Ltd. ("Gharda Chemicals"). In
four issues, CSI argues that the trial court erred when (1) it ruled that it did not have
specific jurisdiction over Gharda Chemicals; (2) it failed to consider Gharda
Chemicals's post-injury contacts with Texas in its general jurisdictional analysis; (3)
it did not find the exercise of jurisdiction reasonable in light of traditional notions of
fair play and substantial justice; and (4) it ruled that jurisdiction over Gharda
Chemicals could not be imputed through the application of the alter ego, single
business enterprise, and agency doctrines.

 We reverse and remand.

Facts

 Control Solutions is a Texas corporation that, among other things, mixes and
sells insecticides. Its principal place of business is located in Harris County, Texas. 
Mark Boyd serves as the president of Control Solutions. 

 Gharda Chemicals is an Indian corporation with several manufacturing
facilities in India. It was founded by Dr. Keki Gharda, its chairman, managing
director, and principal shareholder, in 1964.

 Sometime in the 1990s, Gharda Chemicals began manufacturing Chlorpyrifos,
an insecticide, and Dicamba, an herbicide, and decided to enter the United States
market. After its first attempt at entering that market failed, Gharda Chemicals hired
Larry Miller as a consultant to aid in the registration of Chlorpyrifos and Dicamba
with the Environmental Protection Agency ("EPA"); without registration, the
chemicals could not legally be sold in the United States. Gharda Chemicals applied
for registration in its own name in 1996, and the EPA conditionally approved the
registration in early 1997. 

 In March 1997, Gharda Chemicals established Gharda USA, Inc. ("GUSA")
as a wholly-owned subsidiary "specifically to represent Gharda Chemical[s] in the
United States." Gharda Chemicals solely capitalized GUSA and retained total
ownership of all GUSA stock. Dr. Gharda and J.A. Somaiya, who are both directors
of Gharda Chemicals, served as two of the four directors of GUSA. The third director
was Uda Maroo, Gharda Chemicals' chief financial officer, and the fourth was Mamu
Tabbaykan, the sole "US director." Anthony Maro became president of GUSA in
2000. As president of GUSA, Maro wrote monthly reports to Dr. Gharda that
included how much product had been sold, to whom, and at what price; how much
money was outstanding; and, according to Dr. Gharda, why Maro "constantly needed
infusions of money from Gharda Chemicals to keep himself afloat." 

 After GUSA was formed, Gharda Chemicals transferred the EPA registrations
for Chlorpyrifos and Dicamba to GUSA; but, according to Maro, GUSA made no
cash payments for these transfers because there was "no money to do that with, and
. . . no assets to do it with." Ten million dollars that Gharda Chemicals had paid to
Dow Chemicals and BASF for the right to cite their data to the EPA for registration
purposes were transferred onto GUSA's books. Gharda Chemicals also initially paid
for GUSA's membership in various task forces because, according to Dr. Gharda,
"GUSA was just a shell company initially. It didn't . . . have any business. So it
didn't have any resources to pay." GUSA was thus created, owned, and controlled
by Gharda Chemicals and served as the U.S. distributor for Chlorpyrifos and
Dicamba.

 In making purchases of the Chlorpyrifos manufactured by Gharda Chemicals,
Boyd, the president of Control Solutions, initially dealt with Miller, the consultant
who had been hired by Gharda Chemicals. During his deposition, Boyd testified that
when he was dealing with Miller, he believed Miller to be associated with Gharda
Chemicals because "his stuff that came to me [Boyd] said 'Agent of Gharda
Chemical[s]'" and he said that he was "[a]n agent for Gharda Chemical[s]" and
"worked for Dr. Gharda." Boyd also testified that he did not know that GUSA
existed until he began dealing with Maro and learned that Maro worked for GUSA. 
Boyd further testified that Maro did not make pricing decisions but "went back to Dr.
Gharda to get all these decisions made" and that "typically, it was Dr. Gharda that cut
the deals with me."

 Sometime in 2002, at Dr. Gharda's request, Boyd traveled from Texas to
Chicago to meet with Dr. Gharda. According to Boyd, he and Dr. Gharda discussed
"what new products Dr. Gharda could make for [Boyd] in India to sell in Texas" and
how they could sell more Chlorpyrifos and Dicamba. Boyd suggested that they could
sell substantial quantities of Chlorpyrifos if the price were lowered and they entered
into the professional termiticide market, which later happened. According to Dr.
Gharda, a significant amount of its sales of both Chlorpyrifos and Dicamba,
amounting to millions of dollars, "were centered around Control Solutions." 

 In October 2002, Hoshang Patel, a member of Gharda Chemicals's board of
directors, accompanied Maro, GUSA's president, on a visit to Control Solutions. At
his deposition, Patel explained that the purpose of his visit was to let Control
Solutions know that Gharda Chemicals "was also interested in the products sold
here," that it "was watching this deal," and if there were ever a problem, Gharda
Chemicals would "stand by its products." Gharda also provided support by
communicating with Howard Stoddard of Control Solutions regarding the procedure
for melting Chlorpyrifos and providing other technological support when GUSA's
representatives were not able to answer customers' questions.

 On March 8, 2004, 32 drums containing the solid chemical Chlorpyrifos, which
had been manufactured by Gharda Chemicals in India, sold to Control Solutions by
Gharda Chemicals's wholly-owned subsidiary, GUSA, and subsequently shipped
from India to Houston, Texas, were placed in a "hot box" in Control Solutions'
warehouse for melting pursuant to a procedure received from Gharda Chemicals. 
Each drum had been sealed at Gharda Chemicals's plant in India, and the seals on the
drums were not broken until immediately before the drums were put in the hot box. 
At some point during the melting process, the Chlorpyrifos caught on fire and blew
open the doors of the hot box. The fire spread throughout the warehouse and to a
second building. Everything inside those two buildings was destroyed, including
some inventory belonging to United Phosphorous. Subsequent analysis by Control
Solutions revealed that the drums of Chlorpyrifos were contaminated with flammable
chemicals. 

 In September 2004, Gharda Chemicals dissolved GUSA. GUSA's assets were
transferred to Gharda Chemicals and, according to Patel, GUSA "stop[ped] doing
business" and "Gharda Chemicals . . . stepped into the same offices with the same
employees, same warehouse, same customers and start[ed] doing business."

 On December 1, 2004, Control Solutions filed suit against several parties,
including GUSA and Gharda Chemicals, for products liability, breach of express
warranty, breach of implied warranty of merchantability, and negligence. At some
point thereafter, United Phosphorous intervened in Control Solutions' suit. On
January 14, 2005, Gharda Chemicals filed a special appearance with the trial court
contesting the court's exercise of personal jurisdiction over it. The trial court granted
the special appearance without issuing findings of fact or conclusions of law. CSI
filed this interlocutory appeal.

Personal Jurisdiction In its first issue, CSI argues that the stream of commerce doctrine confers
specific personal jurisdiction over Gharda Chemicals. 

 Standard of Review

 Whether a court has personal jurisdiction over a defendant is a question of law
subject to de novo review. BMC Software Bel., N.V. v. Marchand, 83 S.W.3d 789,
794 (Tex. 2002); Glattly v. CMS Viron Corp., 177 S.W.3d 438, 445 (Tex.
App.--Houston [1st Dist.] 2005, no pet.). The trial court, however, must frequently
resolve questions of fact before deciding the jurisdictional question. BMC Software,
83 S.W.3d at 794. When the trial court issues findings of fact and conclusions of law,
we may review the findings of fact on legal and factual sufficiency grounds and
review the conclusions of law de novo as a legal question. Silbaugh v. Ramirez, 126
S.W.3d 88, 94 (Tex. App.--Houston [1st Dist.] 2002, no pet.) (citing BMC Software,
83 S.W.3d at 794). If the trial court does not issue findings of fact and conclusions
of law, as here, "all facts necessary to support the judgment and supported by the
evidence are implied." BMC Software, 83 S.W.3d at 795. In other words, if the trial
court does not issue findings of fact, a reviewing court should presume that the trial
court resolved all factual disputes in favor of its judgment. Tri-State Bldg.
Specialties, Inc. v. NCI Bldg. Sys., L.P., 184 S.W.3d 242, 246 (Tex. App.--Houston
[1st Dist.] 2005, no pet.) (citing Am. Type Culture Collection, Inc. v. Coleman, 83
S.W.3d 801, 806 (Tex. 2002)). These findings are not conclusive when the appellate
record includes both the reporter's and clerk's records, and they may be challenged
for legal and factual sufficiency on appeal. Id. To the extent that the underlying facts
are undisputed, however, we conduct a de novo review. Glattly, 177 S.W.3d at 445. 

 The plaintiff bears the initial burden of pleading sufficient allegations to bring
a nonresident defendant within the provisions of the Texas long-arm statute. BMC
Software, 83 S.W.3d at 793. A nonresident defendant challenging the court's
exercise of personal jurisdiction through a special appearance carries the burden of
negating all grounds for personal jurisdiction alleged by the plaintiff. Id.; Glattly,
177 S.W.3d at 446.

 Texas Long-Arm Statute and Due Process

 Two requirements must be met before a Texas court can exercise personal
jurisdiction over a nonresident defendant: (1) the Texas long-arm statute must
authorize the exercise of jurisdiction and (2) the exercise of jurisdiction must be
consistent with guarantees of due process. Moki Mac River Expeditions v. Drugg,
221 S.W.3d 569, 574 (Tex. 2007); Tri-State, 184 S.W.3d at 248.

 The Texas long-arm statute permits Texas courts to exercise personal
jurisdiction over a nonresident (1) defendant that "does business" in Texas. Tex. Civ.
Prac. & Rem. Code Ann. § 17.042 (Vernon 1997); BMC Software, 83 S.W.3d at
795. The statute lists three activities that constitute "doing business": (1) contracting
with a Texas resident when either party is to perform the contract in whole or in part
in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas
residents for employment inside or outside of Texas. Tex. Civ. Prac. & Rem. Code
Ann. § 17.042. This list, however, is not exclusive, (2) and the statute's "doing
business" requirement is limited only by the requirements of federal due process
guarantees. Koll Real Estate Group, Inc. v. Purseley, 127 S.W.3d 142, 146 (Tex.
App.--Houston [1st Dist.] 2003, no pet.).

 With respect to personal jurisdiction, federal due process requires two things. 
First, the nonresident defendant must have purposefully established such minimum
contacts with the forum state that the defendant could reasonably anticipate being
sued there. Glattly, 177 S.W.3d at 447 (citing Burger King Corp. v. Rudzewicz, 471
U.S. 462, 475-76, 105 S. Ct. 2174, 2183-84 (1985)). A nonresident establishes
minimum contacts with Texas by purposefully availing itself of the privileges and
benefits inherent in conducting business in the state. Moki Mac, 221 S.W.3d at 575
("defendant must seek some benefit, advantage or profit by 'availing' itself of the
jurisdiction"); Koll, 127 S.W.3d at 146. It is the quality and nature of the defendant's
contacts, rather than their number, that is important to the minimum-contacts analysis. 
Trigeant Holdings, Ltd. v. Jones, 183 S.W.3d 717, 725 (Tex. App.--Houston [1st
Dist.] 2005, pet. denied). Random, fortuitous, or attenuated acts, or the unilateral acts
of a third party, are not sufficient to confer personal jurisdiction. Id. Although not
determinative, foreseeability is an important consideration in deciding whether a
nonresident defendant has purposefully established minimum contacts. Glattly, 177
S.W.3d at 446-47.

 Second, if the nonresident defendant has purposefully established minimum
contacts with the forum, the exercise of personal jurisdiction must also comport with
traditional notions of fair play and substantial justice. Id. at 447 (citing Burger King,
471 U.S. at 476-77, 105 S. Ct. at 2184-85). As to fairness, the defendant bears the
burden of presenting a "compelling case" that exercising jurisdiction over him would
not be fair and just. See id. at 450. Only in rare cases will a Texas court's exercise
of personal jurisdiction not comport with fair play and substantial justice when the
nonresident defendant has purposefully established minimum contacts with the forum
state. Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815
S.W.2d 223, 231 (Tex. 1991).

 We, therefore, analyze Gharda Chemicals's contacts with Texas to determine
whether they satisfy the "minimum contacts" requirement of due process under the
Texas long-arm statute and the Fourteenth Amendment. If so, we must determine
whether the Texas courts' exercise of jurisdiction over Gharda Chemicals comports
with traditional notions of fair play and substantial justice. Minimum Contacts The minimum contacts element of due process is divided into specific and
general personal jurisdiction. Glattly, 177 S.W.3d at 447; Moki Mac, 221 S.W.3d at
575-76; Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990) (explaining that
United States Supreme Court has "refined the minimum contacts analysis by
identifying recurring fact patterns and outlining guidelines for application of the due
process test to these patterns"--i.e., specific and general jurisdiction).

 A court may exercise general jurisdiction over a nonresident defendant if the
defendant's contacts with the forum state are continuous and systematic, even if the
cause of action did not arise from or relate to the defendant's contacts with the forum. 
Glattly, 177 S.W.3d at 447. This inquiry demands that all contacts be carefully
investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and
systematic activity. Schlobohm, 784 S.W.2d at 359.

 A court may exercise specific jurisdiction over a nonresident defendant if his
alleged liability arises out of or is related to an activity conducted within the forum. 
Moki Mac, 221 S.W.3d at 576; Glattly, 177 S.W.3d at 446 (citing CSR, Ltd. v. Link,
925 S.W.2d 591, 595 (Tex. 1996)). The contacts must be purposefully directed at the
forum and have a "substantial connection" with the forum state that results in the
alleged injuries. Burger King, 471 U.S. at 473-76, 105 S. Ct. at 2182-84; Moki Mac,
221 S.W.3d at 584-85; Shell Compañia Argentina de Petroleo, S.A. v. Reef
Exploration, Inc., 84 S.W.3d 830, 837 (Tex. App.--Houston [1st Dist.] 2002, pet.
denied). In considering specific jurisdiction, we focus our analysis on the
relationship among the defendant, the forum, and the litigation.  Moki Mac, 221
S.W.3d at 575-76.

 Here, CSI argues that the Texas courts have specific personal jurisdiction over
Gharda Chemicals under the stream of commerce doctrine.

Stream of Commerce Doctrine

 The stream of commerce doctrine stems from World-Wide Volkswagen Corp.
v. Woodson, in which the United States Supreme Court stated, "The forum state does
not exceed its powers under the Due Process Clause if it asserts personal jurisdiction
over a corporation that delivers its products into the stream of commerce with the
expectation that they will be purchased by consumers in the forum State." 444 U.S.
286, 297-98, 100 S. Ct. 559, 567 (1980). Later, however, in Asahi Metal Industry
Co. v. Superior Court of California, Solano County, a plurality of the Court held that
the placement of a product into the stream of commerce, absent additional conduct
indicating an intent to serve the market of the forum state, is not an act of the
defendant purposefully directed toward the forum state. 480 U.S.102, 112, 107 S. Ct.
1026, 1032 (1987); CSR, 925 S.W.2d at 595. Likewise, the Texas Supreme Court has
held that "the mere sale of a product to a Texas resident will not generally suffice to
confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate
that the seller intended to serve the Texas market." Moki Mac, 221 S.W.3d at 577
(citing CSR, 925 S.W.2d at 595; Asahi, 480 U.S. at 112, 107 S. Ct. at 1032). This
rule accords with the due process requirement that a nonresident defendant must take
action that is purposefully directed towards the forum state. Id. (citing Asahi, 480
U.S. at 112, 107 S. Ct. at 1032). 

 In determining whether the defendant purposefully directed action towards
Texas, we may look to conduct beyond the particular business transaction at issue,
as "[a]dditional conduct of the defendant may indicate an intent or purpose to serve
the market in the forum State." Moki Mac, 221 S.W.3d at 577 (quoting Asahi, 480
U.S. at 112, 107 S. Ct. at 1032). Some examples of "additional conduct" that may
indicate an intent to serve the market of the forum state are: (1) designing the product
for the market in the forum state; (2) advertising in the forum state; (3) establishing
channels for providing regular advice to customers in the forum state; and (4)
marketing the product through a distributor who has agreed to serve as the sales agent
in the forum state. Asahi, 480 U.S. at 111, 107 S. Ct. at 1032. 

 Intent to serve the Texas market alone is not sufficient, however, to confer
specific jurisdiction over a foreign defendant. For a Texas court to exercise specific
jurisdiction over a nonresident defendant, two requirements must be met: (1) not only
must the defendant have established minimum contacts with Texas by purposefully
availing itself of the privilege of conducting activities here, but also (2) the
defendant's liability must have arisen from or be related to those contacts. Moki Mac,
221 S.W.3d at 576 (citing Am. Type Culture, 83 S.W.3d at 806).

 We, therefore, examine the record for evidence both that Gharda Chemicals
purposefully directed acts towards Texas indicating that it intended to serve the Texas
market and that its liability arises from its contacts with Texas. 

Purposeful Availment

 In CSR, the Texas Supreme Court held that the nonresident defendant did not
purposefully direct any act toward Texas indicating that it intended to serve the Texas
market. 925 S.W.2d at 596. In that case, CSR, an Australian company, sold 363 tons
of asbestos to another company in Australia, which then shipped the asbestos to
Houston where it was used to manufacture pipe. Id. at 593-94. In reaching its
conclusion, the Supreme Court noted that CSR did not advertise its asbestos in Texas,
provide advice to Texas buyers, have any sales agents in Texas, or create, control, or
employ the distribution system that brought the asbestos to Texas, and there was no
direct evidence that CSR knew that the 363 tons of asbestos would be distributed in
Texas. Id. at 595-96. Likewise, in Michiana Easy Livin' Country, Inc. v. Holten, the Texas Supreme
Court held that Michiana did not have the requisite minimum contacts with Texas for
jurisdiction to attach. 168 S.W.3d 777 (Tex. 2005). In that case, Holten, a Texas
resident, telephoned Michiana in Indiana and purchased an RV, which Michiana
shipped to Holten in Texas at Holten's expense. Id. at 784. A dispute arose, and
Holten sued Michiana in Texas. Id. at 781. Michiana had no employees or property
in Texas, was not authorized to do business in Texas, did not advertise in Texas or
over the internet, and had not solicited business from anyone in Texas, including
Holten. Id. at 784. "Michiana's only contact with Texas was Holten's decision to
place his order from there." Id. at 794. Thus, the Supreme Court held that there was
no conduct by Michiana purposefully establishing minimum contacts that justified the
exercise of specific jurisdiction over Michiana by the Texas courts. See id.

 Here, the factual situation is virtually the opposite of that in CSR and Michiana. 
Gharda Chemicals began manufacturing Chlorpyrifos in the 1990s and decided to
enter the U.S. market. In March 1997, it established a wholly owned and controlled
subsidiary, GUSA, to market its chemicals in the United States. Gharda Chemicals
obtained EPA registration for Chlorpyrifos and Dicamba and then transferred the
EPA registration for Chlorpyrifos to GUSA. Gharda and GUSA established an on-going business relationship with Control Solutions in Texas for the sale of Gharda
Chemicals's products, which were manufactured in India and shipped to Texas
pursuant to contract.

 Boyd, president of Control Solutions, initially dealt with Miller, who,
according to Boyd, was working as an agent for Gharda Chemicals. Boyd later dealt
with Maro, the president of GUSA, but testified that Maro did not make pricing
decisions, but "went back to Dr. Gharda" for pricing decisions, and that "typically it
was Dr. Gharda that cut the deals with [Boyd]." In October 2002, Patel accompanied
Maro on a visit to Control Solutions. At his deposition, Patel explained that the
purpose of his visit was to let Control Solutions know that Gharda Chemicals "was
also interested in the products sold here," "was watching this deal," and if there was
ever a problem, Gharda Chemicals would "stand by its products." Also in 2002, at
Dr. Gharda's request, Boyd traveled to Chicago to meet with Dr. Gharda. According
to Boyd, he and Dr. Gharda discussed "what new products Dr. Gharda could make for
[Boyd] in India to sell in Texas" and how they could sell more Chlorpyrifos and
Dicamba. Boyd suggested that they could sell substantial quantities of Chlorpyrifos
if the price were lowered and they entered into the professional termiticide market,
which later happened. A very significant amount of Gharda Chemicals's sales in the
United States of both Chlorpyrifos and Dicamba "were centered around Control
Solutions." (3) Thus, Gharda Chemicals had both direct and indirect systematic contacts
with Control Solutions in Texas. 

 Several months after the fire in Texas that gave rise to this litigation, Gharda
Chemicals dissolved GUSA, absorbed its assets, and undertook direct operations in
the United States. According to Patel, a member of Gharda Chemicals's board of
directors, GUSA "stop[ped] doing business" and "Gharda Chemicals . . . stepped into
the same offices with the same employees, same warehouse, same customers and
start[ed] doing business."

 Based on the foregoing, we conclude that Gharda Chemicals established
minimum contacts with Texas because it purposefully availed itself of the privileges
and benefits inherent in conducting business in Texas. See Koll, 127 S.W.3d at 146;
see also Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (defining "doing business").

Liability Related to Forum Contacts

 For specific jurisdiction purposes, however, purposeful availment has no
jurisdictional relevance unless the defendant's liability arises from or relates to the
forum contacts. Moki Mac, 221 S.W.3d at 579. In assessing the strength of the
necessary connection, the Texas Supreme Court has held that "for a nonresident's
forum contacts to support an exercise of jurisdiction, there must be a substantial
connection between those contacts and the operative facts of the litigation." Id. at
585 (emphasis added).

 In Moki Mac, the Texas Supreme Court held that the nonresident defendant's
activities in Texas were not sufficiently related to the facts of the litigation. Id. at
588. In that case, the plaintiffs' 13-year-old son died on a river rafting trip in Arizona
with Moki Mac, a Utah-based river rafting outfitter. Id. at 573. Although Moki Mac
had not directly solicited the plaintiffs to participate in the trip, the court found that
Moki Mak had purposefully availed itself of the privileges and benefits inherent in
conducting business in Texas by selling rafting trips to Texas residents; purposefully
directing marketing efforts to Texas with the intent to solicit business from the state;
regularly advertising in Texas; hiring public relations firms to target media groups
and tour operators, some of which were located in Texas; soliciting Texas residents
through mass and targeted direct-marketing e-mail campaigns; compiling and
obtaining a mailing list that included Texas residents; and utilizing particular
customers, some of whom were located in Texas, to act as de facto group leaders for
the planning, organizing, and promoting of trips. Id. at 577-78. The court held,
however, that the relationship between these contacts and the operative facts of the
litigation--the guides' conduct on the rafting trip and whether they exercised
reasonable care in supervising the plaintiffs' son--were "too attenuated to satisfy
specific jurisdiction's due-process concerns." Id. at 585, 588.

 Here, in contrast, in March 2004, 32 drums containing Chlorpyrifos, which had
been manufactured by Gharda Chemicals in India, were sold to Control Solutions in
Texas by GUSA, shipped directly from India to Texas, and stored in Control
Solutions' warehouse in Texas. The drums were unsealed and placed in a "hot box"
for melting pursuant to a procedure received by Control Solutions from Gharda
Chemicals. Each drum had been sealed at Gharda Chemicals's plant in India, and the
seals on the drums were not broken until immediately before the drums were put in
the hot box. Sometime during the melting process, the Chlorpyrifos caught on fire
and blew open the doors of the hot box. The fire spread throughout the warehouse
and to a second building. Everything inside those two buildings was destroyed,
including inventory belonging to United Phosphorous. Subsequent analysis by
Control Solutions revealed that the drums of Chlorpyrifos were contaminated with
flammable chemicals.

 CSI alleged four causes of action against Gharda Chemicals: (1) strict products
liability; (2) breach of express warranty; (3) breach of implied warranty of
merchantability; and (4) negligence. All four causes of action center around the
allegation that the drums of Chlorpyrifos put in the hot box in March 2004 were
contaminated with flammable chemicals, which ultimately caused the fire at Control
Solutions. Thus, the operative facts of the litigation concern the fire and the
contamination of the drums of Chlorpyrifos, and the related questions of (a) whether
this contamination rendered the Chlorpyrifos defective, (b) whether the delivery of
the contaminated drums breached an express warranty, the implied warranty of
merchantability, or both, and (c) whether Gharda Chemicals exercised reasonable care
in the manufacture and packaging of the Chlorpyrifos. 

 Given the facts of this case, we conclude that Gharda Chemicals's liability
"arises from or relate[s] to the forum contacts." See Moki Mac, 221 S.W.3d at 579. 
Because Gharda Chemicals purposefully availed itself of the privileges and benefits
of doing business in Texas and because its alleged liability arises from or relates to
the forum contacts, the minimum contacts prong of personal jurisdiction is satisfied. 

 Fair Play and Substantial Justice

 Having found that Gharda Chemicals purposefully established minimum
contacts with Texas, we must consider whether the exercise of personal jurisdiction
over it comports with traditional notions of fair play and substantial justice. See
Glattly, 177 S.W.3d at 447 (citing Burger King, 471 U.S. at 476-77, 105 S. Ct. at
2184-85). In making this inquiry, we consider, when appropriate, (1) the burden on
the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the
plaintiff's interest in obtaining convenient and effective relief; (4) the interstate
judicial system's interest in obtaining the most efficient resolution of controversies;
and (5) the shared interest of the several states in furthering fundamental, substantive
social policies. Guardian Royal, 815 S.W.2d at 231. 

 First, there is no undue burden on Gharda Chemicals in defending this case in
Texas. Gharda Chemicals owns 100% of the stock of GUSA, which has not contested
the trial court's exercise of jurisdiction and against whom CSI's suit will go forward
here in Texas. Moreover, Gharda Chemicals has been directly conducting business
in Texas since dissolving GUSA and purchasing all of its assets in September 2004. 

 Second, Texas has an interest in resolving this dispute because it involves
injury to a Texas corporation and Texas has a substantial interest in protecting its
citizens against harm from dangerous products entering this state. See Gen.
Refractories Co. v. Martin, 8 S.W.3d 818, 823 (Tex. App.--Beaumont 2000, pet.
denied) (finding that Texas has a manifest interest in protecting residents exposed to
products alleged to be unreasonably dangerous). 

 Third, as a Texas resident, Control Solutions can obtain the most convenient
and efficient relief in Texas. Fourth, the efficient resolution of this controversy is
promoted by adjudication in Texas because none of the other parties have contested
jurisdiction; and trying CSI's suit against Gharda Chemicals in Texas will avoid
duplication of efforts and minimize the possibility of inconsistent findings on
common issues. See J.D. Fields & Co. v. W.H. Streit, Inc., 21 S.W.3d 599, 605 (Tex.
App.--Houston [1st Dist.] 2000, no pet.) (finding efficient resolution of controversy
promoted by adjudication in Texas because suit against defendant company's surety
was still pending in Texas and reconsolidating suit against defendants with suit
against surety avoided duplication of efforts and minimized possibility of inconsistent
findings on common issues). We do not address the fifth factor, as only one state is
involved in this dispute.

 Accordingly, we hold that the exercise of personal jurisdiction over Gharda
Chemicals does not offend traditional notions of fair play and substantial justice. 
Glattly, 177 S.W.3d at 447 (citing Burger King, 471 U.S. at 476-77, 105 S. Ct. at
2184-85). The exercise of personal jurisdiction over Gharda Chemicals is supported
by the evidence and is, therefore, proper.

 We sustain CSI's first issue. (4)

Conclusion

 We reverse the order of the trial court that granted Gharda Chemicals's special
appearance and remand the cause to the trial court for further proceedings consistent
with this opinion. 


 Evelyn V. Keyes

 Justice


Panel consists of Chief Justice Radack and Justices Keyes and Higley.
1. A "nonresident" includes "an individual who is not a resident of [Texas]" and "a
foreign corporation, joint-stock company, association, or partnership." Tex. Civ.
Prac. & Rem. Code Ann. § 17.041 (Vernon 1997).
2. BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002)
.
3. Upon questioning by plaintiff's counsel, Patel admitted that of the 50 states, Texas is
ranked in the top five as a market for Gharda Chemicals's products.
4. Because our resolution of CSI's first issue is dispositive of this appeal, we need not
reach CSI's remaining issues. See Tex. R. App. P. 47.1.