**Vincenzo MINUCCI, Appellant,**

v.

**SOGEVALOR, S.A., Appellee.**

Nos. 01–98–01221–CV, 01–98–01327–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 2, 2000.

James R. Leahy, Emilio F. Deayala, Robert Paddock, Houston, for appellant in No. 01–98–01221–CV.

Emilio F. Deayala, James R. Leahy, Houston, for appellant in No. 01–98–01327–CV.

John A. Lee, David A. Zdunkewicz, William Scott Locher, Houston, for appellee in No. 01–98–01221–CV.

John A. Lee, Houston, for appellee in No. 01–98–01327–CV.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE.*

## OPINION

FRANK C. PRICE, Justice (Assigned).

This is an interlocutory appeal from the denial of the special appearance by appel-

lant, Vincenzo Minucci. We reverse the decision of the trial court and render judgment that Minucci's special appearance be granted.

## SUMMARY[1]

Appellee, Sogevalor, S.A., is a Swiss portfolio/money management company. Its business consists of receiving money from European investors, as their trustee, and investing that money in investments around the world. Sogevalor plans and oversees the investments it makes for its clients.

Minucci is an Italian citizen who engages in the same type of business. He operates his money management business as a sole proprietor. He, like Sogevalor, receives money from his European clients and makes decisions on how to invest their money.

This case is based on Minucci's transactions in Texas. In the course of his investment activities, Minucci was president of Davstar I, which lost a significant amount of the funds Minucci's and Sogevalor's clients invested. As the president of Davstar I, Minucci was subject under European laws to potential personal liability for the repayment of the lost investments to the clients. Minucci approached Sogevalor for a loan to cover Davstar's losses. Sogevalor agreed to make the loan in the form of an investment through a new company, Piedmont Investments N.V., to be operated and managed by Dibo Attar, a Houston, Texas resident. Sogevalor asked Minucci to sign the guaranty at issue in this case in which Minucci promised to repay the newly invested funds, plus a 20 percent return. Sogevalor then invested $2,087,507 in Piedmont, and Minucci executed the guaranty agreement as chairman of Davstar. Davstar's investment operations were run from Houston, Texas. Minucci failed to repay the promised amount, and Sogevalor filed this suit for collection.

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. Because the trial court did not issue findings of fact, all questions of fact must be presumed to support the trial court's denial of

the special appearance. *Hawsey v. Louisiana Dep't of Soc. Servs.*, 934 S.W.2d 723, 725 (Tex.App.—Houston [1st Dist.] 1996, writ denied). Many of the facts are in dispute, but they are presented here in the light most favorable to Sogevalor.

## PERSONAL JURISDICTION

In point of error one, Minucci argues the trial court's finding that the due process clause of the Constitution authorizes jurisdiction over him was erroneous, because his contacts with Texas were limited and sporadic.

### Standard of Review

■ Rule 120a of the Rules of Civil Procedure allows a party to appear specially, without making a general appearance, to object to the jurisdiction of the court over the party, or the party's property, "on the ground that such party or property is not amenable to process issued by the courts of this State." TEX.R. CIV. P. 120a; *Abacan Technical Services Ltd. v. Global Marine Int'l Services Corp.*, 994 S.W.2d 839, 843 (Tex.App.—Houston [1st Dist.] 1999, n.p.h.). The words "not amenable to process" mean that the special appearance is available solely to establish that the Texas court cannot, under the federal and state constitutions and the applicable state statutes, validly obtain jurisdiction over the person or property of the defendant with regard to the cause of action pled. *GFTA Trendanalysen B.G.A. Herrdum GMBH & Co., K.G. v. Varme*, 991 S.W.2d 785, 786 (Tex.1999).

■ On appeal from a special appearance, we review all evidence in the record to determine if the nonresident defendant negated all possible grounds for personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985); *Abacan*, 994 S.W.2d at 843. The review, however, is not de novo. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 892 (Tex.App.— Fort Worth 1997, pet. denied). The proper standard for reviewing the evidence in a case involving a challenge to personal jurisdiction is factual sufficiency. *Id.* After reviewing all of the evidence, we may reverse the decision of the trial court only if its ruling is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ When, as here, the trial court does not file findings of fact in a special appearance, all questions of fact are presumed to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex.App.—Houston [1st Dist.] 1998, writ denied). A reviewing court must affirm if the judgment can be upheld on any legal theory supported by the evidence. *Happy Indus. Corp. v. American Specialties, Inc.*, 983 S.W.2d 844, 847 (Tex.App.—Corpus Christi 1998, no writ).

### Due Process

■ A court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1999). The Texas long-arm statute reaches as far as the federal and state constitutional guarantees of due process allow. *Garner*, 966 S.W.2d at 802.

The activities specifically identified as "doing business" in Texas include the following:

(1) contracting by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) committing a tort in whole or in part in this state;

(3) recruiting Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). In addition to this short list, the statute provides "other acts" by the nonresident that can satisfy the requirement. *Id.; Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). The Texas Supreme Court has repeatedly interpreted this broad statutory language "to reach as far as the federal constitutional requirements of due process will allow." *CSR,* 925 S.W.2d at 594. Therefore, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

■■■■■ The United States Constitution permits a state to exert personal jurisdiction over a nonresident defendant only if the defendant has some minimum, purposeful contacts with the state, and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson–Austin v. Austin,* 968 S.W.2d 319, 326 (Tex.1998). A nonresident who has purposefully availed himself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *CSR,* 925 S.W.2d at 594; *Garner,* 966 S.W.2d at 803. A defendant, however, should not be subject to the jurisdiction of a foreign court based upon random, fortuitous, or attenuated contacts. *CSR,* 925 S.W.2d at 595.

**Minimum Contacts**

■■■■■ A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Id.* General jurisdiction is present when a defendant's contacts are continuous and systematic, allowing the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Id.* General jurisdiction requires a showing the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *Id.*

■■■■■ Specific jurisdiction, however, is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* In such cases, however, the minimum contacts analysis becomes more demanding, because the contacts must be substantial. *James v. Illinois Cent. Railroad Co.,* 965 S.W.2d 594, 597 (Tex.App.—Houston [1st Dist.] 1998, no writ). When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ). We will affirm the trial court's finding of personal jurisdiction if specific jurisdiction is supported by the evidence. *Happy Indus. Corp.,* 983 S.W.2d at 847.

Due to the lack of findings of fact, we may affirm the trial court's judgment only if the evidence supports specific jurisdiction. *Id.* So, our jurisdictional analysis is limited to specific jurisdiction.

■■■■■ In analyzing minimum contacts, it is not the number, but rather the quality and nature of the nonresident's contacts with the forum state that are important. *Memorial Hosp. Sys.,* 835 S.W.2d at 650. The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state. *Guardian Royal,* 815 S.W.2d at 226. The substantial connection between the nonresident defendant and the forum state necessary for a finding of minimum contacts must come about by action or conduct of the nonresident purposefully directed toward the forum state. *Id.* This requirement that a defendant purposefully avail himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, ensures that a defendant will not be haled

into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. *Burger King v. Rudzewicz* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985); *Garner,* 966 S.W.2d at 803.

 Foreseeability is also an important consideration in deciding whether the nonresident has purposefully established minimum contacts with the forum state. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the nonresident defendant and Texas arising from actions or conduct of the nonresident defendant purposefully directed toward Texas. *Id.* If the tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions. *Memorial Hosp. Sys.,* 835 S.W.2d at 650.

 With respect to interstate contractual obligations, the United States Supreme Court has emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions in the other state for consequences of their activities. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182. So long as it creates a substantial connection with the forum state, even a single act can support jurisdiction. *Id.* at 471 U.S. 475 n. 18, 105 S.Ct. at 2184.

 Minimum contacts, however, are especially important when dealing with a nonresident from a foreign country. *CSR,* 925 S.W.2d at 595; *Garner,* 966 S.W.2d at 803. Mere travel to Texas is insufficient to establish continuous and systematic contact with the forum state. *Holt Oil & Gas v. Harvey,* 801 F.2d 773, 779 (5th Cir. 1986); *Garner,* 966 S.W.2d at 803.

## Minucci's Contacts

 In the late 1960s, Minucci first met Attar when Minucci went to work as a salesman for Fideuram, a European company. Attar was Minucci's supervisor. Fideuram was a financial services company that sold mutual funds to European investors. In 1972 or 1973, Minucci followed Attar to a new company, Interfid, at which Minucci also did sales work for the financial services company. In the late 1970s, Attar moved to Houston, Texas, where he has since resided. Attar either formed or became a consultant for many companies that invested in real estate in Texas and throughout the United States. These real estate investment companies were operated out of Houston and were incorporated in the Netherlands Antilles. To make the investments, the companies had to attract money. The Netherlands Antilles real estate investment companies ("the offshore entities") attracted their money from overseas investors. Minucci's investors invested in these offshore entities, either directly or through Sogevalor. These companies were operated out of Houston, Texas. In connection with his clients' investments in these companies, Minucci came to Houston, Texas, as many as four times, during which time he met with Attar and discussed various projects for the companies' investments. During these trips, Attar introduced Minucci to builders, joint venture partners, lawyers, accountants, brokers, and other business people who were involved in the real estate projects, and they dined together at Attar's home and at restaurants. In addition to making trips to Houston, Attar acknowledged that Minucci telephoned and spoke to him in Houston on a regular basis.

In 1986, based on tax code changes, Attar was advised that he should consolidate the offshore companies, and Capital Holdings, Inc. was formed as a Delaware corporation. Since its formation in 1986, the principal office of Capital Holdings has been in Houston, Texas. Most of the offshore real estate investment companies

managed by Attar became subsidiaries of Capital Holdings, and the investors in the many original offshore companies became investors in the parent holding company of Capital Holdings.

Attar also formed another domestic company, Woodco, through which he consulted with Sogevalor and Minucci by reviewing and analyzing investment opportunities for Sogevalor's and Minucci's clients. Woodco, like Capital Holdings, is a Delaware corporation that operates solely from its office in Houston, Texas. Woodco is a management company that manages investments made by the offshore entities. Three offshore entities whose investments Woodco managed in Texas and Switzerland and for whom Attar gave investment advice in Texas were Davstar I, Davstar II, and the Bridge Fund. These entities were similarly designed to bring in capital from overseas investors so that the companies could make investments in the United States. The books and records of these three entities were kept in the Houston, Texas offices of Woodco and Capital Holdings. The operating personnel responsible for the day-to-day activities of Woodco/Capital Holdings were Houston residents who worked in the Houston office. All decisions regarding the investment activities of the entities were conducted by Woodco and Capital Holdings in the Houston office.

The Woodco/Capital Holdings relationship with Minucci was a mutually profitable one. Woodco earned money by charging a management fee to the offshore entities, which was based on a percentage of the amount of the investments they managed. The more capital contributed to the offshore companies was available for investment, the higher the management fee Woodco/Capital Holdings collected. Woodco also earned an investment fee on certain investments and a profit partic-

ipation fee on investments that made a profit.

The success of Woodco/Capital Holdings and Attar depended on the successful recruitment of capital to be invested and from which Woodco/Capital Holdings could earn its fees. Minucci participated in this recruitment process. Woodco's documents refer to Minucci and other persons who recruited the investment money from foreign investors as "agents," "salesmen," and "associates." From 1992–93, Minucci, as an agent, salesman, or associate of Woodco,[2] solicited over $1.2 million from European investors for contribution to Davstar I and solicited a like amount for contribution to the Bridge Fund. While soliciting this money, Minucci had many communications with Attar and Woodco at their Houston offices.

When Davstar I was formed in 1992, Minucci came with five or six other agents to Houston to meet with Attar at Capital Holdings' office. While in Houston, Minucci and the other agents were entertained by Attar and Woodco, and the entertainment expenses were paid by Woodco.

As compensation for his money-raising efforts relating to the offshore entities managed by Attar, Minucci earned four types of fees: (1) management fees, (2) investment fees, (3) profit participation fees, and (4) manager fees. The manager fee was directly related to the amount of money raised by other agents whom Minucci had recruited to the process.

As a result of the money Minucci solicited for investment into the offshore entities, which were managed in Houston, since April of 1992, Minucci earned commissions every month through at least April 1998. The commissions were calculated in Woodco/Capital Holdings's offices, and the money was wired from a Houston bank to Minucci via an account in Switzerland in the name of Davstar Managed

**2.** Minucci contests this representation, but absent findings of fact, we must presume this fact question, resolved by the trial court, sup-

ports the denial of the special appearance. *See Hawsey,* 934 S.W.2d at 725.

Corp. N.V., over which Minucci had signatory authority. By May of 1993, Minucci had received $26,423 in commissions for his money-raising efforts for Davstar, which efforts were based on his business dealings with Attar and Woodco/Capital Holdings in Houston. It was demonstrated that Minucci earned and was paid at least $122,786.86 in commissions from a Houston bank for Davstar and the Bridge Fund since 1993.

With respect to his investment activities between 1992 and the present, Minucci has come to Houston on at least four documented occasions. First, he came to Houston with five or six other agents in 1992 at the inception of Davstar I and the Bridge Fund. While he was in Houston, the evidence showed Woodco/Capital Holdings entertained Minucci as though he was a client. Minucci was in Houston over a two-week period in November of 1994 to work in Woodco/Capital Holdings' office reviewing records regarding investments he had made for his clients. During this visit, Woodco/Capital Holdings entertained Minucci at several Houston establishments. In January of 1997, Minucci returned to work in Woodco/Capital Holdings' offices and was again entertained. He was in Houston again in January and February of 1998 to work in Woodco/Capital Holdings' offices. Woodco entertained Minucci on at least two occasions during the 1998 trip.

In addition to soliciting investments for Davstar and Bridge Fund, receiving monthly commissions from his relationship with Woodco/Capital Holdings, and making occasional trips to Houston, Minucci has also sought and received investment advice from Woodco/Capital Holdings for the purpose of passing that advice on to his clients. Minucci also relied on Woodco/Capital Holdings' investment advice to invest his clients' funds in other offshore companies which used capital raised by Minucci to make United States investments.

Minucci was a 20% shareholder in a company, GTD Capital Holdings N.V., and as a shareholder, entered into an agreement with the other three shareholders (two of which are the owners of Sogevalor, while the third is Attar). They agreed that each could ask for a meeting to be held at the offices of GTD Capital Holdings N.V. in Houston. As an aside, GTD Capital Holdings N.V. sued Sogevalor in Harris County, Texas.

Based on this evidence, we hold there were sufficient minimum contacts to assert personal jurisdiction over Minucci.

**Fair Play and Substantial Justice**

 Having found personal jurisdiction, we must now decide whether the trial court's assertion of jurisdiction comports with traditional notions of fair play and substantial justice. *Guardian Royal*, 815 S.W.2d at 228. In this inquiry, it is necessary that Minucci present a compelling case that the presence of some consideration would render the assertion of jurisdiction unreasonable. *Id.* at 231. This determination can be made by considering the following factors: (1) the burden on the defendant; (2) the interests of Texas in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interest of the interstate judicial system in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.; James*, 965 S.W.2d at 599.

Texas has no interest in adjudicating this dispute. The cause of action did not occur in Texas; neither party is a resident of this state; Swiss law governs the dispute, none of the investors were Texas citizens, and the contract was written in Italian. Thus, Texas would not be protecting its citizens from the potential future actions of Minucci.

Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established

minimum contacts with the forum state. The rare cases have generally been restricted to those involving international defendants. *James,* 965 S.W.2d at 602; *see e.g., Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *Guardian Royal,* 815 S.W.2d at 232–33; *Juarez v. United Parcel Service de Mexico S.A. de C.V.,* 933 S.W.2d 281, 286 (Tex.App.—Corpus Christi 1996, no writ). In these cases, the presence of an international defendant tends to be a determinative factor in finding that the exercise of personal jurisdiction would be unreasonable. *James,* 965 S.W.2d at 602.

The primary goal of the due process clause as it relates to personal jurisdiction, however, is fairness to foreign defendants. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990); *Garner,* 966 S.W.2d at 803. Requiring Italian citizens and residents to have to defend this suit in Texas when their contacts with the forum were slight and not related to Sogevalor's causes of action does not comport with traditional notions of fair play and substantial justice. *See Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1265 n. 4 (5th Cir.1981); *Garner,* 966 S.W.2d at 803.

We sustain point of error one.

## FIDUCIARY SHIELD

In point of error two, Minucci asserts that the fiduciary shield doctrine prevents his contacts from serving as a basis for personal jurisdiction, because the contacts he had with Texas were in his representative capacity.

Having sustained point of error one, it is unnecessary for us to address point of error two.

## "SUBJECT TO"

In point of error three, Minucci contends the trial court erred when it held his

failure to include the term "subject to" in his motion to dissolve the writ of garnishment [3] constituted a general appearance. Sogevalor never contended filing of the *motion* waived the special appearance.

Sogevalor argues the trial court's judgment was "invoked" by the mere filing of the *notice of hearing* on the motion to dissolve writ of garnishment. On January 13, 1998, Minucci filed a special appearance to dispute jurisdiction. On March 10, 1998, he filed a motion to dissolve writ of garnishment. The motion was not filed subject to the special appearance, and the only reference to the special appearance was in a listing of the procedural history found in the motion. Neither the conclusion nor the prayer referenced the special appearance. The declarations of Minucci and Attar which were attached to the motion did not refer to or defer to the special appearance. The order on the motion to dissolve writ of garnishment did not mention the special appearance. A notice of hearing was filed with the motion to dissolve writ of garnishment setting the motion for hearing on March 20, 1998, at 9:00 a.m. On March 12, 1998, two days after the notice of hearing for the motion to dissolve the writ of garnishment was filed, Minucci filed a notice of hearing on his amended special appearance, also to be heard on March 20, 1998, at 9:00 a.m. The special appearance was ultimately denied on May 1, 1998, and the motion to dissolve the writ of garnishment was never heard.

▬▬ Personal jurisdiction is waivable. *Burger King,* 471 U.S. at 472, 105 S. Ct at 2182 n. 14; *Abacan,* 994 S.W.2d at 843. A party enters a general appearance whenever it invokes the judgment of the court on any question other than the court's jurisdiction; if a defendant's act recognizes that an action is properly pending or seeks affirmative action from the court, that is a general appearance. *Daw-*

---

**3.** The trial court granted Sogevalor's writ of garnishment, because Sogevalor was concerned that Minucci's New York bank ac-

counts might be depleted in the wake of this litigation.

*son–Austin v. Austin,* 968 S.W.2d 319, 322 (Tex.1998).

Rule 120a(1), however, makes matters in the same instrument and subsequent matters subject to the special appearance without an express statement to that effect for each matter. Tex.R. Civ. P. 120a(1) (Vernon 2000); *Dawson–Austin,* 968 S.W.2d at 322. Regardless, Sogevalor contends the mere filing of the notice of oral hearing on the motion to dissolve writ of garnishment was an attempt to "seek" or "invoke" affirmative action from the court. The notice of oral hearing was filed after the special appearance was filed.

■■■ Minucci was obliged to request that hearing on his motion to dissolve writ of garnishment be deferred until after the special appearance. Rule 120a(2) states: "Any motion to challenge the jurisdiction provided for herein shall be heard and determined before a *motion to transfer venue* or any other plea or pleading may be heard." Tex.R. Civ. P. 120a(2) (Vernon 2000). Sogevalor entered into a Rule 11 agreement with Minucci, wherein Minucci's hearing on his motion to dissolve writ of garnishment was indefinitely postponed. Minucci did not waive his special appearance by simply filing a notice of oral hearing on the motion to dissolve writ of garnishment.

Rule 120a of the Texas Rules of Civil Procedure pertains to special appearances. The rule specifically states:

> The issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance.

Tex.R. Civ. P. 120a(1). Nothing in Rule 120a limits discovery to matters relating to the special appearance. The Texas Supreme Court seems to have interpreted the rule to allow discovery of facts *only* relevant to the special appearance issues. *See Dawson–Austin,* 968 S.W.2d at 323. In *Dawson–Austin,* the court stated, "Dawson–Austin was also entitled to seek a postponement of the special appearance hearing until she could complete discovery, as expressly permitted by Rule 120a, and she was entitled to ask for more time for discovery on her motion to quash, *provided she did not attempt to take that discovery before the special appearance was decided." Id.* (emphasis added.) In applying this analysis to Minucci, before the resolution of the special appearance, he was entitled to conduct discovery only on the special appearance, not on the garnishment.

The basis for Minucci's motion to dissolve writ of garnishment was that the funds garnished in New York were not his, but were his clients'—despite the fact that the account was in his name. Minucci's declaration attached to the motion to dissolve writ of garnishment specifically stated:

> The assets in the account subject to the garnishment are not mine. They are assets of several of my clients, that I invest for them as trustee. This practice is not unfamiliar to Sogevalor as it also holds assets in its name for the benefit of its clients.

On April 16, 1998, Russell S. Molina, the secretary/treasurer of Woodco, was deposed, ostensibly for special appearance purposes. Counsel for Minucci questioned Molina regarding issues relating to the garnishment as follows:

Q: Are you familiar with Sogevalor holding assets in the United States in its own name?

A: Yes.

Q: Has Sogevalor ever argued or explained to you that those assets were truly the assets of its clients?

A: Yes.

Q: So you understand that Sogevalor has taken the position that it may hold a stock or a note or an asset in its own name in the United States but it does so on behalf of the clients?

A: Yes.

Q: And the beneficial owners and the real owners of those assets are its clients?

A: Yes.

. . . .

Objection: Objection. Calls for speculation, and that's a totally irrelevant question.

. . . .

Q: Mr. Molina, you are aware, are you not, that there is a brokerage account at a company called The Duke in the name of Vincenzo Minucci and it's in New York City; right?

A: Yes.

Q: Or the state of New York. Does Woodco Fund Management manage that account?

A: No.

Q: Do you understand the assets held in that account to be assets of or monies derived from Netherlands Antilles' companies?

A: Yes.

Objection: Let me object. There's no foundation here. And Mano, we are getting far afield. We're getting into the merits of the lawsuit, not the special appearance, I don't believe, of what we're here for today.

From this line of questioning at Molina's deposition, it is evident that counsel for Minucci was trying to elicit testimony supporting his motion to dissolve the writ of garnishment. His questions were not related to any of the grounds raised by Sogevalor in an attempt to defeat Minucci's special appearance and were beyond the scope of discovery necessary to support his special appearance.

 We decline, however, to follow the dicta in *Dawson–Austin,* and instead follow the plain language of the statute. The use of the discovery process does not constitute a waiver of special appearance. *See Hotel Partners v. Craig,* 993 S.W.2d 116, 123 (Tex.App.—Dallas 1994, pet. denied); *International Turbine Service, Inc. v. Lovitt,* 881 S.W.2d 805, 809 (Tex.App.—Fort Worth 1994, writ denied); *Moore By and Through Moore v. Elektro–Mobil Technik GmbH,* 874 S.W.2d 324, 328 (Tex.App.—El Paso 1994, writ denied); *Letersky v. Letersky,* 820 S.W.2d 12, 14 (Tex.App.—Eastland 1991, no writ).

We sustain point of error three.

We hold the trial court abused its discretion when it denied Minucci's special appearance.

Accordingly, we reverse the judgment and render judgment that Minucci's special appearance be granted.