Opinion issued October 11, 2007








Opinion issued October 11, 2007
 
     

 
 
 
 
 
 
 
 
 
 
In The
Court 
of Appeals
For The
First 
District of Texas
 



 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 
 
NO. 01-06-00546-CV
 



 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 
 
CHRIS UCHE, M.D., Appellant
 
V.
 
MELODY ALLISON, INDIVIDUALLY AND AS REPRESENTATIVE OF 
THE ESTATE OF DOROTHY MUELLER, Appellee
 
 
 
On Appeal from the 56th District 
Court
Galveston County, Texas
Trial Court Cause No. 
02-CV-1436
 
 
 
O P I N I O N
 

          
In this medical malpractice suit, appellant, Chris Uche, M.D., brings an 
accelerated interlocutory appeal challenging the trial court’s order denying his 
motion for special appearance.  In 
one issue on appeal, Dr. Uche argues that the trial court erred in denying his 
special appearance in favor of appellee, Melody Allison, individually and as 
representative of the estate of Dorothy Mueller (collectively 
“Allison”).
          
We reverse and render.
BACKGROUND
          
The facts of this dispute can be found in a prior opinion from this 
Court.[1]  Dorothy Mueller boarded a Carnival 
Cruise Ship that departed from Galveston on February 21, 2002.  Because Mrs. Mueller has a feeding tube, 
her son-in-law and her daughter, Melody, went along with her.[2]  During the voyage, Mrs. Mueller’s 
feeding tube became dislodged.  
According to Allison’s third amended petition, Mrs. Mueller attempted to 
get care from the ship’s infirmary, where one doctor, Dr. Uche, and three nurses 
were stationed.  It is undisputed 
that Mrs. Mueller did not get her feeding tube reinserted on the cruise 
ship.  A couple of weeks after the 
cruise, Mrs. Mueller had a stroke that is alleged to have been the result of the 
negligent care given aboard the ship.  
Allison filed suit against various parties, including Dr. Uche, the head 
nurse, and Carnival Cruise Lines.  
In our prior opinion, we held that while Dr. Uche worked aboard the ship, 
the Celebration, he served as an independent contractor and that Mrs. 
Mueller’s injury occurred in international waters.[3]   
          
Dr. Uche filed a special appearance arguing that the trial court lacked 
both general and specific jurisdiction over him.  The trial court denied Dr. Uche’s motion 
for special appearance on May 15, 2006. 
          
On December 27, 2006, while this appeal was pending, Dr. Uche moved for 
sanctions, alleging that Allison made “gross misstatements of fact and concocted 
arguments [that] lack even a scintilla of merit or credibility independently, or 
collectively, in addition to Appellees’ brief containing such an inordinate 
amount of falsehoods, inventions and deceptions . . . .”  On January 30, 2007, we ordered that the 
motion for sanctions be carried with the case.  Dr. Uche moved to stay the trial 
proceedings, and, on December 8, 2006, we ordered that the commencement of trial 
be stayed pending resolution of this appeal.  See Tex. Civ. Prac. & Rem. Code Ann. 
51.014(b) (Vernon Supp. 2006).  

PERSONAL 
JURISDICTION
          
In his sole issue on appeal, Dr. Uche argues that the trial court erred 
when it denied his special appearance.  

          
Standard of Review
          
Whether a court has personal jurisdiction over a defendant is a question 
of law subject to de novo review.  
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 
2002); Glattly v. CMS Viron Corp., 177 S.W.3d 438, 445 (Tex. App.—Houston 
[1st Dist.] 2005, no pet.).  The 
trial court, however, must frequently resolve questions of fact before deciding 
the jurisdictional question.  BMC 
Software, 83 S.W.3d at 794.  If 
the trial court enters an order denying a special appearance and issues findings 
of fact and conclusions of law, we may review the findings of fact on legal and 
factual sufficiency grounds and review the conclusions of law de novo as a legal 
question.  Silbaugh v. 
Ramirez, 126 S.W.3d 88, 94 (Tex. App.—Houston [1st Dist.] 2002, no pet.) 
(citing BMC Software, 83 S.W.3d at 794).  
          
If the trial court does not issue findings of fact and conclusions of 
law, as here, “all facts necessary to support the judgment and supported by the 
evidence are implied.”  BMC 
Software, 83 S.W.3d at 795.  In 
other words, if the trial court does not issue findings of fact, a reviewing 
court should presume that the trial court resolved all factual disputes in favor 
of its judgment.  Tri-State Bldg. 
Specialties, Inc. v. NCI Bldg. Sys., L.P., 184 S.W.3d 242, 246 (Tex. 
App.—Houston [1st Dist.] 2005, no pet.) (citing American Type Culture 
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002)).  These findings are not conclusive when 
the appellate record includes both the reporter’s and clerk’s records, and they 
may be challenged for legal and factual sufficiency on appeal.  Id.  To the extent that the underlying facts 
are undisputed, however, we conduct a de novo review.  Glattly, 177 S.W.3d at 
445.
          
Two requirements must be met before a Texas court can exercise personal 
jurisdiction over a nonresident defendant.  
First, the Texas long-arm statute must authorize the exercise of 
jurisdiction, and second, the exercise of jurisdiction must be consistent with 
the guarantees of due process.  
Coleman, 83 S.W.3d at 806; Tri-State, 184 S.W.3d at 
248.
          
The long-arm statute permits Texas courts to exercise personal 
jurisdiction over a nonresident[4] defendant that “does business” in 
Texas.  Tex. Civ. Prac. & Rem. Code Ann. § 
17.042 (Vernon 1997); BMC Software, 83 S.W.3d at 795.  The statute lists three activities that 
constitute “doing business”: (1) contracting with a Texas resident when either 
party is to perform the contract in whole or in part in Texas; 
(2) committing a tort in whole or in part in Texas; and (3) recruiting 
Texas residents for employment inside or outside of Texas.  Tex. Civ. Prac. & Rem. Code Ann. 
§ 17.042.  This list, 
however, is not exclusive,[5] and the statute’s “doing business” 
requirement is limited only by the requirements of federal due process.  Koll Real Estate Group, Inc. v. 
Purseley, 127 S.W.3d 142, 146 (Tex. App.—Houston [1st Dist.] 2003, no pet.) 
(citing Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 
1990)).
          
Because the language of the long-arm statute is broad, its requirements 
are considered satisfied if the exercise of personal jurisdiction comports with 
federal due process limitations.  
CSR, Ltd. v. Link, 925 S.W.2d 591, 594 (Tex. 1996).  In practice, the two conditions are 
combined into one requirement of due process.  Wright v. Sage Eng’g, Inc., 137 
S.W.3d 238, 247 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).  Thus, the true determinative inquiry is 
one of federal constitutional due process.  
See id.; see also Guardian Royal Exch. Assurance, Ltd. v. 
English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 
1991).
          
With respect to personal jurisdiction, federal due process requires two 
things.  First, the nonresident 
defendant must have purposefully established such minimum contacts with the 
forum state that the defendant could reasonably anticipate being sued 
there.  Glattly, 177 S.W.3d 
at 447 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76, 105 
S. Ct. 2174, 2183–84 (1985)).  
Second, if the nonresident defendant has purposefully established minimum 
contacts with the forum, the exercise of personal jurisdiction must also comport 
with traditional notions of fair play and substantial justice.  Id. (citing Burger King, 
471 U.S. at 475–76, 105 S. Ct. at 2183–84).  As to fairness, the defendant bears the 
burden of presenting a “compelling case” that exercising jurisdiction over him 
would not be fair and just.  See 
id. at 450.  Only in rare cases, 
however, will a Texas court’s exercise of personal jurisdiction not comport with 
fair play and substantial justice when the nonresident defendant has 
purposefully established minimum contacts with the forum state.  Guardian Royal Exch. Assurance, 
815 S.W.2d at 231.
          
A nonresident establishes minimum contacts with Texas by purposefully 
availing itself of the privileges and benefits inherent in conducting business 
in the state.  Michiana Easy 
Livin’Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005); Koll, 
127 S.W.3d at 146.  The touchstone 
of jurisdictional due process is “purposeful availment,” i.e., “it is essential 
in each case that there be some act by which the defendant purposefully 
avails itself of the privilege of conducting activities within the forum 
State, thus invoking the benefits and protections of its laws.” Michiana, 
168 S.W.3d at 784 (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S. 
Ct. 1228, 1240 (1958)) (emphasis in Michiana).  Three aspects of the requirement are 
important in this case, as in Michiana: (1) only the defendant’s contacts 
with the forum count, not the unilateral activity of another party or person; 
(2) the acts relied on to establish jurisdiction must be “purposeful” rather 
than fortuitous; and (3) the defendant must seek some benefit, advantage, or 
profit by “availing” itself, or himself, of the jurisdiction.  Id. at 785.  It is the quality and nature of the 
defendant’s contacts, rather than their number, that is important to the 
minimum-contacts analysis.  
Trigeant Holdings, Ltd. v. Jones, 183 S.W.3d 717, 725 (Tex. 
App.—Houston [1st Dist.] 2005, pet. denied).  Random, fortuitous, or attenuated acts, 
or the unilateral acts of a third party, are not sufficient to confer personal 
jurisdiction.  Id.  Although not determinative, 
foreseeability is an important consideration in deciding whether a nonresident 
defendant has purposefully established minimum contacts.  Glattly, 177 S.W.3d at 
446–47.
          
The minimum contacts element of due process is further divided into 
specific and general personal jurisdiction.  Id. at 447.  A court may exercise specific 
jurisdiction over a nonresident defendant if his alleged liability arises from, 
or is related to, an activity conducted within the forum.  Id. (citing CSR, 925 
S.W.2d at 595).  The contacts must 
be purposefully directed at the forum and have a “substantial connection” that 
results in the alleged injuries.  
Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, 
Inc., 84 S.W.3d 830, 837 (Tex. App.—Houston [1st Dist.] 2002, pet. 
denied).  We focus our analysis on 
the relationship among the defendant, the forum, and the litigation.  Id.  
          
A court may exercise general jurisdiction over a nonresident defendant if 
the defendant’s contacts with the forum state are continuous and systematic, 
even if the cause of action did not arise from or relate to the defendant’s 
contacts with the forum.  
Glattly, 177 S.W.3d at 447.  
In confining one’s activities to another forum, “a nonresident may 
purposefully avoid a particular jurisdiction by structuring its transactions so 
as neither to profit from the forum’s laws nor be subject to its 
jurisdiction.”  Michiana, 168 
S.W.3d at 785.  For the court to 
have specific jurisdiction, the nonresident defendant must have established 
minimum contacts by purposefully availing itself of the privilege of conducting 
activities in Texas and there must be a substantial connection between those 
contacts and the operative facts of the litigation.  Moki Mac River Expeditions v. 
Drugg, 221 S.W.3d 569, 576, 585 (Tex. 2007).  
          
The plaintiff bears the initial burden of pleading sufficient allegations 
to bring a nonresident defendant within the provisions of the Texas long-arm 
statute.  BMC Software, 83 
S.W.3d at 793.  A nonresident 
defendant challenging the court’s exercise of personal jurisdiction through a 
special appearance carries the burden of negating all grounds for personal 
jurisdiction alleged by the plaintiff.  
Id.; Glattly, 177 S.W.3d at 446.
          
General Jurisdiction
          
On appeal, Allison contends that Dr. Uche had continuous and systematic 
contacts with Texas because the ship on which he practiced took on 1,300 Texans 
every week for a four-month period.  
Under the section of the petition styled “Long Arm Statute,” Allison 
alleges that Dr. Uche is 
amenable to jurisdiction in Texas because [he] has 
purposefully established minimum contacts with Texas.  Specifically, [he] sought employment 
with Carnival Corporation so as to be stationed in Galveston, Texas for months 
at a time.  For each week that 
Defendants worked out of the Galveston port, over 1,000 Texas residents and 
others coming to Texas boarded the ship.  
The individual Defendants purposefully put themselves in the position of 
providing medical care to any Texas resident who needed care during the 
cruise.  When medical care personnel 
deliberately station themselves so as to be giving care to Texas residents for 
months at a time, Texas has a substantial interest in ensuring the quality of 
that care.  Additionally, since 
Defendants contract to work for Carnival for half a year at a time out of 
Galveston, Texas or other United States ports, it would not be unduly burdensome 
or otherwise unfair to them to defend this suit in Galveston, Texas. 

 
Allison argues that the trial court 
has general jurisdiction over Dr. Uche and that Dr. Uche had continuous and 
systematic contacts with Texas because of the number of passengers who came 
aboard the Celebration and the number of passengers who visited the 
infirmary during the time that the Celebration was stationed in 
Galveston. Dr. Uche argues that he did not have continuous and systematic 
contacts with the state to subject him to general jurisdiction.  
          
The head nurse on the Celebration, Constance Jackson, testified by 
deposition that she worked on the Celebration for four months. Jackson 
estimated that the Celebration’s infirmary would see 20 passengers and 50 
crew persons a week.  She testified 
that there were a lot of Texans on board, but that people came from other states 
as well.[6]  She said that the Celebration 
would leave port once a week on average and that approximately 1,300 passengers 
would board the Celebration every week.  Out of the 2,000 person capacity of the 
Celebration, there were three passengers to every crew member.  The ship would stay in port for eight 
hours to unload passengers and pick up new passengers, and it would then set out 
to sea.
          
In his deposition, Dr. Uche testified that he worked on the 
Celebration for a four-month period.  He testified that Carnival assigns the 
doctors to the ships and that he was on the ship 99% of the time.  He would fly into one of the Houston 
airports and then take a shuttle from the airport to the 
Celebration.  He flew at 
least twice to the two Houston airports.  
He stated that if a nurse saw something she cannot handle, she was 
supposed to contact the doctor.  Dr. 
Uche stated that while aboard the ship, he could not refuse medical help to a 
person, but that in certain circumstances he could refuse to see a patient.  He clarified his answer to say that if 
someone came to see him, he would have to see them.  If a passenger came to see him in the 
infirmary, he would never refuse to see them.  The infirmary had a morning session and 
an afternoon session, and he was on call 24 hours a day.  Dr. Uche stated that if a passenger 
boarded the ship with a headache, the passenger could come to the infirmary and 
get some aspirin.  He clarified that 
most of the time while they were in port, the infirmary was closed.  If someone became sick while at sea, the 
clinic would arrange for the patient to be transported to a facility on land 
once the ship docked.  

          
Dr. Uche is not licensed to practice medicine in Texas, and he has never 
practiced medicine in Texas.  He 
neither owns any property in Texas nor pays any taxes on any property in 
Texas.  Dr. Uche testified that he 
conducts no business of any kind in Texas.  
He only handled patients while on board the Celebration, and he 
only saw patients after the ship had gone into international waters.  
          
General jurisdiction requires a showing that the defendant conducted 
“substantial activities” within the forum, which requires a more demanding 
minimum contacts analysis than specific jurisdiction.  Coleman, 83 S.W.3d at 807; 
Guardian Royal Exch. Assurance, 815 S.W.2d at 228.  Thus, general jurisdiction presents a 
“more onerous” burden of proof.  
Marchand, 83 S.W.3d at 797.  
In essence, under general jurisdiction, the contacts “should be such as 
to justify categorizing the defendant as a resident of this State.”  Schexnayder, 187 S.W.3d at 
243.  “[O]ne suggested method of 
determining whether general jurisdiction over a defendant truly lies in Texas is 
by determining whether a citizen of another state, on a claim for wrongdoing in 
another state, could nevertheless properly sue the defendant in Texas 
courts.”  Schexnayder, 187 
S.W.3d at 243 (citing Charles Rhodes, The Predictability Principle in 
Personal Jurisdiction Doctrine:  A 
Case Study on the Effects of a “Generally” too Broad, but “Specifically” too 
Narrow Approach to Minimum Contacts, 57 Baylor L. Rev. 135, 149–55 
(2005)).
          
Dr. Uche contends that he does not have minimum contacts with Texas 
because any contact he had with Texas was not chosen by Dr. Uche, but rather by 
Carnival, and that the unilateral acts of a third party do not meet the 
requirements of a defendant who purposefully avails himself of the benefits and 
protections of Texas law.  For 
instance, Dr. Uche argues that “Carnival’s voluntary choice to have Galveston be 
a port of departure for its cruise line, is a unilateral act of its own, for 
which Uche is not responsible.”  Dr. 
Uche also argues that 
the fact that Carnival happens to have customers 
(passengers), albeit Texas residents or residents of other states, is likewise a 
result of Carnival’s (or arguably the customer/passenger’s) unilateral acts . . 
. . Any monies paid to Uche by Carnival, on account of the Carnival/Uche 
contract, executed in Georgia, for work to be performed in international waters 
does not transform Uche into an entity that is purposefully availing itself of 
the privilege of doing business in Texas.
 
          
Allison argues that Dr. Uche had ample contacts with Texas to justify 
jurisdiction.  Namely, the trial 
court has general and specific jurisdiction over Dr. Uche based on the fact that 
“Mrs. Mueller was one of approximately 1,300 Texans that boarded the Carnival 
Celebration every week before it left its home port of Galveston.”  Allison further argues that “the 1,300 
Texans were the sole source of patients for the months he was based in 
Galveston” and that Dr. Uche “made himself available to over 20,000 Texans for 
medical care as he set up shop on the Carnival cruise ship across a 30’ 
gangplank from Galveston.”  Allison 
argues that “[t]he incident giving rise to this suit was a result of Uche’s 
repeated weekly contacts with Texas made in pursuit of his medical 
practice.”  
          
Allison has pleaded that
[He] sought employment with Carnival Corporation so as 
to be stationed in Galveston, Texas for months at a time . . . The individual 
defendants purposefully put themselves in the position of providing medical care 
to any Texas resident who needed care during the cruise.  When medical care personnel deliberately 
station themselves so as to be giving care to Texas residents for months at a 
time, Texas has a substantial interest in ensuring the quality of that 
care.
 
          
We limit our analysis to Dr. Uche’s contacts with the state, not 
Carnival’s contacts with the state.[7]  See Moki Mac, 221 S.W.3d at 575 
(stating that, for purposeful availment, “only the defendant’s contacts with the 
forum are relevant, not the unilateral activity of another party or a third 
person”).  Here, while it may have 
been foreseeable that Dr. Uche would commit some act or fail to act and that his 
actions could lead to litigation in Texas, the record in this case does not 
reflect that Dr. Uche himself, purposefully directed any act toward Texas.  See CSR Ltd., 925 S.W.2d at 596 
(“Absent . . . a purposeful act, foreseeability alone cannot create minimum 
contacts between [the defendant] and Texas.”).  
          
Allison’s pleading that Dr. Uche purposefully “sought employment with 
Carnival Corporation so as to be stationed in Galveston, Texas for months at a 
time” is refuted by Dr. Uche’s statement that Carnival assigns him to a 
specific ship.  He stated that 
“Carnival assigns you, but sometimes you can request.”  He clarified, “[W]ell, that’s where I 
was assigned.  I mean, see, working 
for a company you can’t really say, well, I want to go here.  That’s where I was assigned to go.” 

          
The record does not show that Dr. Uche asked Carnival that he be sent to 
Texas, that he intended to serve the Texas market, that he communicated with 
patients living in Texas, or that he had any substantial contact with Texas 
residents before the ship reached international waters.  See Moki Mac, 221 S.W.3d at 577 
(“Examples of additional conduct that may indicate whether a defendant 
purposefully availed itself of a particular forum include advertising and 
establishing channels of regular communication to customers in the forum 
state.”); see also CSR, 925 S.W.2d at 595 (stating that there must be 
some indication that defendant intended to serve Texas market).  Nor does the record show that the 
alleged tortious medical treatment or failure to give medical treatment occurred 
in Texas.  See Anderson v. 
Bechtle, 2001 WL 930205, at *2 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, 
no pet) (not designated for publication) (“Standing alone, it is difficult to 
see how a failure to act could meet the purposeful availment requirement needed 
to establish personal jurisdiction.”).  
Thus, we conclude that the record does not support Allison’s claims that 
Dr. Uche purposefully put himself in a position to treat Texas 
residents.[8]  
          
Moreover, although Dr. Uche traveled to the state, occasional travel to 
Texas is insufficient by itself to establish continuous and systematic 
contact.  Preussag 
Aktiengesellschaft v. Coleman, 16 S.W.3d 110, 124 (Tex. App.—Houston [1st 
Dist.] 2000, pet. dism’d w.o.j.); Minucci v. Sogevalor, S.A., 14 S.W.3d 
790, 796 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  While it is true that the 
Celebration had its port in Galveston, Texas, and that Dr. Uche stayed on 
the ship during its time in port, port calls are not construed as substantial 
contacts of a quality sufficient to establish a court’s general jurisdiction 
over a nonresident defendant.  
See Asarco, Inc. v. Glenara, Ltd., 912 F.2d 784, 786–87 (5th Cir. 
1990) (finding no jurisdiction and discounting quality of contacts regarding 20 
port calls of vessels to Louisiana because company that managed vessels did not 
choose where vessels would make port); Nicolaisen v. Toei Shipping Co., 
Ltd., 722 F. Supp. 1162, 1165 (D. N.J.1989) (finding that 17 port calls to 
New Jersey over a three-to-four year period and shipowner’s dealing with time 
charterer in New Jersey did not establish general jurisdiction); Am. Overseas 
Marine Corp. v. Patterson, 632 So.2d 1124, 1126–30 (Fla. App. 1994) (finding 
no jurisdiction and discounting quality of contacts relating to port calls in 
Florida because they were not made on the orders of defendants but instead were 
made at the direction of the United States military under contracts with the 
United States).  Thus, the fact that 
the Celebration operated out of Galveston does not support the exercise 
of general jurisdiction over Dr. Uche.  

          
Moreover, Carnival’s decision to make Galveston a port of call diminishes 
the quality of Dr. Uche’s contact—living on a ship that is docked in the port of 
Galveston—with the state.  See 
Farwah v. Prosperous Maritime Corp., 220 S.W.3d  585, 594 (Tex. App.—Beaumont 2007, no 
pet.) (concluding that because decision to make Texas a port of call was made by 
a third party, quality of defendant’s contact diminished); see also Am. Type 
Culture Collection, 83 S.W.3d at 809 (discounting quality of contact 
regarding defendant’s attendance at five conferences in Texas when defendant did 
not select conference locations); Reyes v. Marine Drilling Cos., 944 
S.W.2d 401, 402–04 (Tex. App.—Houston [14th Dist.] 1997, no writ) (discounting 
quality of contact when defendant sent representatives to Texas at least 204 
times to perform quality-assurance inspections that were necessitated under 
contractual obligations between defendant and United States government).   Thus, we also conclude that Dr. 
Uche’s limited presence in the state is not enough to amount to substantial 
activities in the state for a court to exercise general jurisdiction.  
          
Because Dr. Uche’s contacts were not purposefully directed at Texas and 
because the contacts he did have with the state were not continuous and 
systematic, we conclude that the trial court lacks general jurisdiction over Dr. 
Uche.[9] 
          
Specific Jurisdiction
          
We recognize that on one occasion the United States Supreme Court has 
found specific jurisdiction based on alleged wrongdoing intentionally directed 
at a resident of the forum.  See 
Calder v. Jones, 465 U.S. 783, 788–789, 104 S. Ct. 1482, 1486–87 
(1984).  However, the Texas Supreme 
Court has held that the foreseeability of causing injury in another state is not 
a “sufficient benchmark” for the exercise of personal jurisdiction over a 
defendant.  Michiana, 168 
S.W.2d at 789.  Rather, “it is ‘the 
defendant’s conduct and connection with the forum’ that are critical.’”  Id.
          
The operative fact of Allison’s claim with respect to specific 
jurisdiction is Dr. Uche’s alleged failure to give care aboard the 
Celebration.  In her third 
amended petition, Allison states, 
          
There was apparently no qualified physician on board and the nurses on 
board did not have the medical training necessary to reinsert and retape the 
feeding tube, and refused to do so.  
Instead, Carnival informed the Allisons and Mrs. Mueller [that] they had 
to fend for themselves.  As a result 
of the actions and inactions of defendants, Mrs. Mueller suffered a stroke on 
March 16, 2002, which left her significantly impaired far beyond her pre-March 
condition so that her quality of life has been significantly diminished.  
 
          
Allison alleges that Dr. Uche “provided medical care, advice and 
treatment to Dorothy Mueller by assessing her condition, determining her need 
for care, and then abandoning her.”  
At the hearing on Dr. Uche’s special appearance, however, counsel for 
Allison stated that a nurse came to Mrs. Mueller’s cabin and escorted her to the 
infirmary but that, because Mrs. Mueller was in a wheelchair, it was difficult 
to get around in the infirmary.  
Medical personnel then came to Mrs. Mueller’s cabin, but did not inform 
anyone that a medical doctor was on board.  
In short, although Allison alleges that Dr. Uche committed a tort in 
whole or in part in this State and thus satisfies the jurisdictional 
requirements of the Texas Long-Arm Statute and federal due process, there is no 
evidence that he was even made aware of her condition.
          
Allison has not produced any evidence of any connection between Dr. 
Uche’s conduct and contacts with Texas and Mrs. Mueller’s injuries, which are 
alleged to have happened while she was on the Celebration in 
international waters.  See Shell 
Compania Argentina de Petroleo, 84 S.W.3d at 837 (holding that to satisfy 
minimum contacts element of due process, contacts must be purposefully directed 
at forum and have substantial connection that results in alleged injuries).  Allison presented no evidence at the 
special appearance hearing that Dr. Uche was made aware of Dorothy’s need for 
assistance, assessed her medical condition, determined her need for care, or 
abandoned her, as Allison alleges.  
Contrary to Allison’s allegations, Dr. Uche’s affidavit states that it 
was never made known to him, nor was he in any way aware, that Dorothy needed 
medical assistance.  He also states 
that he never had a physician-patient relationship with Dorothy.  Allison did not rebut this 
evidence.  Therefore, we cannot say 
that Dr. Uche’s alleged failure to act on the high seas to treat a passenger 
from Texas, Dorothy, bears a substantial connection with Dr. Uche’s contacts 
with Texas sufficient to subject him to the specific jurisdiction of the courts 
of this state.  Stated another way, 
Dr. Uche’s travel within the state and his temporary residence on board the 
Celebration for the purpose of rendering medical services are not 
sufficiently related to the acts of medical negligence alleged to have taken 
place in international waters to satisfy the requirements of federal due process 
in subjecting him to personal jurisdiction in this state. 
          
We hold that Dr. Uche has negated all grounds for personal jurisdiction 
asserted by Allison.  We conclude 
that the trial court lacks general jurisdiction over Dr. Uche because he did not 
have continuous and systematic contacts with Texas.  We also conclude that specific 
jurisdiction is lacking because his alleged liability to Allison does not arise 
from or relate to his contacts with Texas. 
 
 
 
                   
          
Conclusion
          
We reverse the order of the trial court and render judgment dismissing 
Dr. Uche from the litigation.  We 
deny Dr. Uche’s motion for sanctions.  
We withdraw our December 8, 2006 order that stayed the commencement of 
trial.
 
 
 
 
                                                          
Evelyn V. Keyes
                                                          
Justice
 
Panel consists of Chief Justice 
Radack and Justices Keyes and Higley.
 




[1]In our prior opinion, we conditionally granted mandamus 
relief because the trial court abused its discretion in imposing death penalty 
sanctions against Carnival Cruise Lines.  
See In re Carnival, 193 S.W.3d 229, 237 (Tex. App.—Houston [1st 
Dist.] 2006, orig. proceeding).  


[2]Mrs. Mueller suffered a stroke in early 2000 that 
required her to wear the feeding tube.  
See In re Carnival, 193 S.W.3d at 232.

[3]See In re Carnival, 193 S.W.3d at 234.

[4]A “nonresident” includes “an individual who is not a 
resident of [Texas]” and “a foreign corporation, joint-stock company, 
association, or partnership.”  Tex. Civ. Prac. & Rem. Code Ann. § 
17.041 (Vernon 1997).

[5]BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 
2002).

[6]Other than Jackson’s testimony, Allison presented no 
evidence of the number of Texans onboard the Celebration, but presumably 
it was substantial.

[7]In her response to Dr. Uche’s motion for sanctions, 
Allison requests that this Court take judicial notice that Carnival had 
stationed the Celebration in the port of Galveston since 2000.  Although this may be true, we are not 
concerned with the contacts that Carnival had with Galveston, Texas, but rather 
the contacts that Dr. Uche had.  
See Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 575 (Tex. 
2007).

[8]In her brief, Allison claims that it was Dr. Uche 
himself who stationed himself at that port.  Allison cites no authority or citation 
to the record that Dr. Uche made the decision to work on a ship based in 
Galveston, and the record reveals the opposite—that Carnival made the decision 
to send Dr. Uche to Galveston.

[9]In Florida, the courts of appeals have held that its 
long-arm statute does not allow the court to exercise personal jurisdiction over 
doctors who serve aboard cruise ships unless the injury occurred inside 
Florida’s territorial waters.  
See Elmlund v. Mottershead, 750 So.2d 736, 736 (Fla. Ct. App. 
2000); Benson v. Norwegian Cruise Line Limited, 859 So.2d 1213, 1215 
(Fla. Ct. App. 2003) (reversing order granting special appearance because injury 
occurred within Florida’s jurisdictional waters). 
 
But, in Wurtenberger v. Cunard Line Ltd., a 
cruise ship’s physician, who was not a resident of New York, and who was sued 
for medical malpractice for incidents that did not occur in New York, was 
nevertheless found to be subject to personal jurisdiction under New York’s 
long-arm statute.  370 F. Supp. 342, 
344–45 (S.D. N.Y. 1974).  The court 
found preliminarily that the physician had “transacted business” within the 
state because, although he was not licensed to practice medicine in New York and 
claimed to have been in New York on only four occasions, he was a member of the 
ship’s crew when it departed New York and when it returned to New York, and 
presumably practiced medicine while the ship was in New York waters.  Id. at 344.  With respect to the “nexus” requirement 
of section 302(a)(1), the court determined that the physician was present on the 
ship when passengers boarded in New York, and effectively held himself out as a 
qualified doctor who would treat medical problems on the cruise.  Id. at 345.  Thus, some of the ship’s passengers, 
many of whom were foreseeably New York residents, decided to forego other 
medical services while at sea in reliance on the physician’s competence.  Id.  The court reasoned that “[t]he alleged 
subsequent malpractice in the course of the cruise, therefore, while it did not 
occur in New York, may be said to have arisen out of [the doctor’s] ‘transaction 
of business’ in New York.”  
Id.